**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

SCOTT F. ICEBERG,

       Plaintiff,

v.                                      Case No. 11-10336

WHOLE FOODS MARKET GROUP, INC.,

       Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

In late 2009 and early 2010 a Whole Foods market repeatedly disciplined an
employee, who in time suffered a panic attack and resigned. Before the discipline
began the employee shared a brief and misadventurous affair with a supervisor. The
employee, Scott Iceberg, seeks by this action against Whole Foods to establish both
that the supervisor sexually harassed him and that the end of the affair directly or
indirectly caused him to suffer discipline and a constructive discharge. The relevant
record evidence presented to the court is consistent with Whole Foods' argument: that
Iceberg welcomed much of the supervisor's behavior, that the alleged harassment was
not severe or pervasive, and that Iceberg suffered discipline only for proper reasons
based mainly on a display of bad attitude and bad customer service.

Whole Foods is entitled to judgment as a matter of law. The matter is fully
briefed, and no hearing is needed. *See* E.D. Mich. LR 7.1(f)(2).

**I.  BACKGROUND**

Iceberg was hired in August, 2007, to work at a Whole Foods in Troy, Michigan.

He stocked shelves and served customers in the grocery department.  In June, 2008, he joined the store's "whole body" department, which sells health and hygiene products. *Whole Body*, Whole Foods Market, http:// wholefoodsmarket.com/ department/ whole-body (visited Oct. 10, 2012) ("[T]he point [of the whole body department] is to keep you fit and sassy both inside and out.  That means things like vitamins and minerals as well as shampoo and sunscreen.").  In the whole body department he retained the stocking and serving duties, and eventually he also conducted returns and bought product for the store.  A few months after switching departments Iceberg worked a few days at another Whole Foods nearby.  There he met a Whole Foods "associate team leader" (an assistant store supervisor) named Carine Sergeant.

Soon, in early fall, 2008, Sergeant moved to the Whole Foods in Troy, where before long she became "team leader" (manager) of the whole body department.  She quickly displayed an interest in Iceberg.  Many times in fall, 2008, and winter, 2009, she called him "baby," "sweetie," or "honey."  (Iceberg Dep. 128, Dkt. # 31 Ex. 1.)  She often told him he looked good.  (*Id.* 141.)  At least once, reaching for an item in the stockroom, she brushed against him an awkwardly long time.  (*Id.* 130-32.)  She occasionally touched his arm, shoulder, head, or neck.  (*Id.* 117.)  And she made at least two suggestive comments.  The first occurred before Iceberg went to an out-of-town training event.  Sergeant said she would send Iceberg with a specific employee with whom Sergeant "knew" Iceberg would not have sex.  (*Id.* 120.)  The second happened in response to an online message.  Iceberg wrote to Sergeant, "[S]orry you didn[']t get TL [apparently "team leader"—the position she later received].  [A]t least you get to stay at the cool store with the coolest team."  Sergeant responded, "[Y]a, [I]'m

2

pretty heart broken. . . . [I]'ll get drunk when [I]'m off probation.  [S]igh.  [B]ut I can always take advantage of you sober ;) [.]"  (Dkt. # 31 Ex. 6.)  Iceberg claims that around this time Sergeant also told sexual jokes and said other suggestive things to him, although he cannot recall examples.  He found at least some of Sergeant's behavior in 2008 and early 2009 flattering.  (Iceberg Dep. 156; *see also id.* at 102.) Indeed, two days before he resigned he wrote, "[I]t was clear she liked me [] in more than just a professional way. . . .  I was her favorite for more than just my good work ethic.  I was perfectly fine with this."  (Dkt. # 31 Ex. 20.)

In February, 2009, Iceberg and Sergeant exchanged messages online.  While home injured, Iceberg wrote, "iamsoboredthissucks," to which Sergeant responded by offering to bring Iceberg lunch.  (Dkt. # 31 Ex. 9.)  Five days later Sergeant asked, "When will you grace me with lunch?  I'm buying," and Iceberg answered, "Any day after today would be cool[.]"  (*Id.* Ex. 10.)  Iceberg alleges that Sergeant often suggested lunch, and that he typically ignored her, but that on this and one other occasion he accepted and they ate together.  (Iceberg Dep. 114.)

About a month after the February 2009 lunch, Iceberg and Sergeant spoke by phone and agreed to meet.  Around 10 p.m. Sergeant drove to Iceberg and his girlfriend's apartment, picked Iceberg up, and drove with him to a liquor store.  (*Id.* 182, 184.)  They went in together, Iceberg chose a bottle of wine, and Sergeant bought it for him.  (*Id.* 185.)  They went to Sergeant's house.  Iceberg consumed most of the bottle, while Sergeant also drank, although less because she had a breathalyzer test scheduled the next morning.  (*Id.* 187.)  After watching television in Sergeant's bedroom, they engaged in sexual relations.  (*Id.* 188-89.)

3

Sergeant and Iceberg apparently never discussed this episode.  (*Id.* 193.)  Their interaction at work appeared unaffected by it for some time.  (*Id.* 198.)  Testimony of a co-worker, Matt Mattoon, suggests that Iceberg felt discomfort.  One night at a bowling alley Iceberg told Mattoon about the affair with Sergeant; Mattoon said the way Iceberg described the sex caused Mattoon to conclude that Iceberg regretted it and that, in hindsight, "it repulsed him."  (Mattoon Dep. 38, Dkt. # 33 Ex. 6.)  On the other hand, when asked whether Iceberg seemed to be bragging Mattoon said, "Sort of, yeah . . . . [H]e was smiling and then he said [] 'I banged her, Bud[.]'"  (*Id.* 71.)

A month or so after their one-night liaison, the store sought applicants for associate team leader of the whole body department.  Sergeant encouraged several employees to apply, but she allegedly told Iceberg, "You're going to be my next [associate team leader]."  (Sergeant Dep. 22-23, Dkt. # 31 Ex. 7; Iceberg Dep. 166.)  Iceberg says (in testimony cited by neither party) that Sergeant told him she could promote him.  (Iceberg Dep. 165.)  Sergeant says an applicant needed the undivided approval of an interview panel.  (Sergeant Dep. 21-22, 28.)  In any event, although Iceberg interviewed, the panel, which included Sergeant, found no candidate qualified and the position remained open.  (*Id.* 26.)  The store accepted applications again in June, and Sergeant again pushed Iceberg and several other employees to apply.  (*Id.* 27.)  Iceberg applied, but another employee (Mattoon) was chosen.  (*Id.* 29.)

Sergeant treated Iceberg well during the summer of 2009.  (Iceberg Dep. 198.)  In August she encouraged him to apply to become the store's vitamin buyer.  She says she thought Iceberg should "keep moving and keep trying for stuff because he was doing a good job."  (Sergeant Dep. 30.)  But Iceberg told Sergeant that, because of

"everything that had happened" between them, he was not interested.  (Iceberg Dep. 214.)  In response, she swore at him.  (*Id.* 218.)  Later the same day she sent him text messages (directed to Iceberg's girlfriend's phone, as Iceberg had none); one said, "You're just acting like a punk bitch," and another, "I'm guessing with your attitude you will soon be looking for another job."  (*Id.* 215-16.)  Until this point, Sergeant had continued her sporadic requests to socialize, and Iceberg had continued quietly to decline.  (*Id.* 201, 204.)  After the quarrel, however, Iceberg twice told Sergeant that he would not see her outside work again.  (*Id.* 205.)  The second time Iceberg told her this, Sergeant said something like, "You're totally protected, you just have to go along with what I say."  (*Id.* 207.)  Iceberg says that he "wasn't sure exactly what [Sergeant] meant" but that her words "terrified" him.  (*Id.* 209.)  Nevertheless, neither the swearing, nor the texts, nor the comment about "protection" motivated Iceberg to report Sergeant's behavior to the store.

From then on, Plaintiff alleges that scorn replaced adoration.  When around Iceberg Sergeant raised her voice or muttered to herself.  (Iceberg Dep. II 173, Dkt. # 31 Ex. 11.)  She ignored some of his requests for a lunch break.  (*Id.* 169.)  She occasionally excluded him from a "huddle" (at Whole Foods, a training session).  (*Id.* 17.)  She scheduled him to work the very busy closing shift by himself.  (*Id.* 172.)  She also changed his duties.  He stopped receiving returns and buying product; he started re-stocking bulk herbs, a task he considered undesirable.  (*Id.* 170.)

But by this time Iceberg's attitude at work had begun to decline.  In fact, the testimony of Mattoon, Sergeant, and Iceberg himself establish that the problem began around June, 2009, before the first signs of acrimony between Iceberg and Sergeant.

(Sergeant Dep. 35; Mattoon Dep. 71-72; Iceberg Dep. II 179.)  According to Mattoon, in summer, 2009, Iceberg "started to completely be defiant[.]  I would ask him as a professional and a friend to carry out a work task and he would tell me 'no.'" (Mattoon Dep. 43.)  Eventually, on October 30, 2009, Sergeant issued Iceberg a "counseling statement" that censured him for unkindness to customers, failure to escort customers to a product, failure to log correctly, and an overall "bad attitude about work."  (Dkt. # 31 Ex. 23.)  On November 5 Sergeant issued an "unsatisfactory work warning" listing similar faults.  (*Id.* Ex. 24.)

Iceberg for the first time complained to others about Sergeant.  On November 1 Iceberg wrote Mattoon, "I really think . . . [Sergeant] want[s] me gone."  (Dkt. # 33 Ex. 12.)  Mattoon responded, "Dude, you are high and paranoid"; he stated that Iceberg worked hard and remained welcome at the store; though he saw fit to add, "[Sergeant's] still sad she has [her boyfriend's] dick in her mouth and not yours."  (*Id.*)  Following the November 5 warning, Iceberg promptly informed Ed Kipela, an associate team leader, that Iceberg and Sergeant "had a brief relationship" and that the relationship "was the principal reason" for the counseling statement and the warning.  (Iceberg Dep. 211.)  In addition, Iceberg told Mattoon, "That demon woman wrote me up again."  (Mattoon Dep. 55.)  Iceberg claims he said also, "[Sergeant is] trying to get me fired and [Kipela's] not going to do anything about it."  (Iceberg Dep. 212.)

Iceberg alleges that Sergeant "manufactured" the October 30 and November 5 criticism.  (*Id.* 253-54.)  But on October 29 Iceberg wrote Mattoon, "Any way I can make [Sergeant's] life suck . . . I will."  (Dkt. # 33 Ex. 12 (ellipsis in original).)  Earlier in October a team leader had warned Iceberg about his bad attitude (Iceberg Dep. 248),

6

and on November 28 Iceberg wrote Sergeant an email that acknowledged his

difficulties:

> I have a hard time . . . being consistently friendly with customers[;] it[']s near
> impossible when I[']m stressed out. . . .
>
> I[']m going to be positive from now on.  I[']m not going to make any sarcastic
> or negative comments to team members or anything like that, even joking
> around, nothing.  It doesn't mean I[']m always going to be bubbly and smiling
> but I[']m not going to be like I have been.  If and when you do have
> something you need to address with me or my performance please just try
> and do it with a smile.  I[']m prone to feeling like I[']m under attack if I sense
> any meanness or anything like that from anyone.  I start freakin[g]. . . .
>
> [T]hanks for being really nice and being on the floor the past few times we
> have worked together.

(Dkt. #31 Ex. 12.)  "I really value your work," Sergeant replied, "[and] I've always been a

huge cheerleader of yours."  (*Id.* Ex. 29.)  She wrote also, "I'm really not against you

and never have been.  I'm really happy that you sent this email and I feel like we can be

pals again."  (*Id.*))

Two more events occurred in early fall, 2009.  First, Iceberg prepared an attempt

to unionize the store.  (*E.g.* Pl.'s Resp. 72, Dkt. # 33.)  Second, Iceberg complained to

the Food and Drug Administration about "suggestive selling" (basically, suggesting

products to a customer) in the whole body department.  (Dkt. # 33 Ex. 23; Iceberg Dep.

II 138-40.)  No record evidence connects either event to Sergeant's or any other team

leader's October and early November 2009 warnings.  Iceberg's response brief claims

that at a meeting around December, 2009, Larry Austin, the head of the store,

"chastised" Iceberg both for "complaining about suggestive selling" and for attempting to

unionize the store.  (Pl.'s Resp. 31.)  Iceberg testified that Austin said he "heard rumors

[Iceberg] was threatening to file complaints"; the response brief, however, does not

7

support the allegation of remarks about unions and suggestive selling with any

admissible record evidence.  (*See also* Iceberg Dep. II 5 (Q: "Did [Austin] say what kind

of complaints [he heard about] or with whom [he heard] you were filing them?" A: "I

don't recall.").)

The meeting with Austin was the next time Iceberg suffered discipline.  With

several team leaders present, Austin addressed Iceberg's poor attitude.  Iceberg says

Austin "ramble[d] on." (*Id.* 7.)  Iceberg insisted that Sergeant wanted him fired "for her

own personal reasons."  (*Id.* 5.)  Austin interrupted and, raising his voice, said,

"[Sergeant] is not trying to get you fired[!]"  (*Id.*)

Iceberg met with Austin again, privately, on January 3, 2010.  (*Id.* 50-51; Austin

Dep. 58, Dkt. # 31 Ex. 28.)  Shortly afterward, in an email to himself, Iceberg recorded

his memory of events:

> After posting on facebook asking for suggestions on organizing a union I was
> pulled into [an] office by the store team leader Larry Austin.  Larry wanted to
> have a "chat" about a phone call he received from another employee stating
> "[Iceberg] is trying to start a union[.]"
>
> Larry went on to say that this is my "right" to do so.  He then went on to say
> this: "at some point I have to start worrying about my job and the harmony of
> the store and your department, so I[']m going to do what I need to do to take
> care of those thing[s.]"
>
> I took this as a veiled threat that if I don't quit "causing trouble" through
> organizing a workers union and standing up for my rights that I would be
> fired.

(Dkt. # 31 Ex. 13.)  "I told [Austin]," Iceberg says, "that everything I had done was well

within my rights."  (Iceberg Dep. II 50.)  He adds that by "within my rights" he meant, in

part, his right to complain about suggestive selling.  (*Id.*)  Iceberg's testimony

establishes, however, that Iceberg never specifically mentioned suggestive selling at the

meeting.  (*See id.* 51, 55.)  (Iceberg's response brief says that at the January 3, 2010, meeting Iceberg complained also about sexual harassment.  (Pl.'s Resp. 32.)  But the email says nothing about Sergeant, and even Iceberg says he merely repeated that Sergeant wanted him fired for "personal reasons."  (Iceberg Dep. II 9, 50, 55.)  "I didn't tell [the team leadership] exactly what happened," Iceberg later wrote.  (Dkt. # 31 Ex. 20.))

On January 13, 2010, Iceberg received a "job dialogue" (for Whole Foods, an evaluation).  Iceberg, Sergeant, and another supervisor, Rose Broadwell, discussed Iceberg's lack of motivation.  (Dkt. # 31, Ex. 14; Iceberg Dep. II 60-61.)  On a self-evaluation form Iceberg wrote, "I[']ve been doing a better job [serving customers] lately. The problem is mostly with consistency."  (Dkt. # 31, Ex. 14.)  Under "Dedication and Commitment: Support and knowledge of [Whole Foods's] mission and core values" Iceberg wrote, "I support some more than others."  (*Id.*)  Following the job dialogue Iceberg was granted a fifty percent raise.  (Iceberg Dep. II 62.)

Iceberg had not asked to transfer to another department (Iceberg Dep. 138), but had asked to work less, expressing a desire to change from forty hours a week to thirty-two.  (Dkt. 31 Ex. 12.)  In the November 28 email to Sergeant he cited the pressure of school as the reason he wanted to work fewer hours.  (*Id.*)  In this litigation he says he wanted to spend less time around Sergeant.  In any event, the hours issue became another source of trouble.

During a January 2010 meeting with Sergeant and Broadwell (a different meeting from the job dialogue), Iceberg learned that he could work twenty-four hours a week, but not thirty-two.  (Iceberg Dep. II 35-38.)  Broadwell says the store had two options: either

Iceberg worked forty hours or he worked twenty-four hours and the store could hire another employee. If Iceberg worked thirty-two hours, explains Broadwell, "[the store] wouldn't be able to hire someone else"—not enough hours open for a new part time position—"and that would [leave] an eight-hour gap on the team. A whole shift would be missing." (Broadwell Dep. 70, Dkt. # 31 Ex. 26.) So Iceberg began working around twenty-four hours a week. Because he dropped below thirty hours, he lost his health benefits. (Dkt. # 31 Ex. 31.)

The schedule for a week in February, 2010, allocated Iceberg twenty-three and a half hours. In an email to Sergeant, Mattoon, and Broadwell, Iceberg wrote, "Anything under 24 [hours] is not acceptable, even if it's only a half hour." (Dkt. # 31 Ex. 16.) Sergeant responded, "You can not talk to me or anyone else in this manner." (*Id.*) Then on February 8, 2010, Iceberg wrote to Broadwell:

> I can[']t assert my rights? [Sergeant] is clearly not rational and she clearly is vindictive.
>
> This is straight up retaliation because I asserted my rights. I have depression and anxiety disorder, I can[']t deal with this kind of harassment, repeatedly! It makes me physically sick being here under these conditions and she knows this . . . .
>
> I keep trying to move forward and I keep being dr[agged] back. I don't want to discuss this anymore ever, I just want it to stop. It[']s not right, it[']s not legal, it[']s not what whole foods is about and for whatever reason you, [Austin], and [Kipela] just don't see it.

(*Id.*) Later on February 8 Iceberg and Broadwell talked in person. Iceberg revealed that he had had a "brief relationship" with Sergeant. (Iceberg Dep. II 76.) And because he "refused to continue with th[e] relationship," he claimed, Sergeant was trying to "make [his] life at work a living hell." (*Id.* 77.) He said that scheduling him to work twenty-three

and a half hours instead of twenty-four was "a perfect example" of Sergeant's

retaliation. (*Id.* 79.) Broadwell said, "I'm not going to let [Sergeant] get you." (*Id.* 78.)

She restored him to twenty-four hours, and the dispute ended. (*Id.* 70, 81.)

The undisputed record shows that Iceberg's poor work performance continued.

Whole Foods employs "mystery shoppers" who visit a store, pretend to shop, and then

report on the service. A "mystery shopper" visited the Troy Whole Foods on February

13, 2010. She later reported that Iceberg failed to escort her to a product, failed to

engage in conversation, and lacked a "sincere professional attitude." (Dkt. # 31 Ex. 17.)

When she asked him about homeopathic remedies he replied, according to her, "I don't

know much about them. It's like superstition. It's like magic." (*Id.*) ("I explained to her,"

Iceberg clarifies, "that herbal remedies have documented efficacy, whereas

homeopathy [i]s based more on superstition." (Iceberg Dep. II 84.)) Broadwell spoke to

Iceberg about the mystery shopper's report. "As we talked about," Broadwell later wrote

to him, "customer service has been a re[-]occuring issue for you, and we need you to

improve in this area and be consistent." (Dkt. # 31 Ex. 18.)

Three weeks after Broadwell's warning, on March 5, 2010, the head of customer

service, Chineda Flowers, sent an email to Sergeant and Mattoon (with a "cc" to the

entire team leadership):

> Hey W[hole] B[ody] Peeps,
>
> We had a customer this evening that was on the fence about purchasing the
> last can of a fiber supplement because there was a dent on the side. We
> went to [Iceberg] for help and he was very rude. He wasn't listening to the
> customer and when I asked if he thought the can was ok, he answered,
> "yeah but I'm not the one that's buying it" right in fro[nt] of the customer. The
> customer had asked him a question already once this evening and she didn't
> even want me to get help from him because that interaction was negative

> (this she told me afterward).  Once he walked away the customer made quite
> a few comments about how unpleasant he was and how he should work
> somewhere else if he doesn't like his job.  She even joked and said she
> would take his job cause he didn't seem to like it.  He did not offer any
> alternative solution and seemed very interrupted by the issue.  Just fyi . . .

(Dkt. # 31 Ex. 32 (ellipsis in original); *see* Sergeant Dep. 90-91.)  The next day, Austin

issued Iceberg a final warning.  (Sergeant Dep. 94.)  Sergeant presented the warning to

Iceberg, who suffered a panic attack and left work early.  (Iceberg Dep. II 87-88.)

That afternoon Iceberg wrote an email to Austin, Broadwell, Kipela, and others.

This is the email in which Iceberg notes he "was perfectly fine" with Sergeant's early

behavior.  The email otherwise displays his altered view:

> [Sergeant] blatantly singles out people on our team that she doesn[']t like and
> holds them to a far higher standard than those she does like, at any given
> moment.  If you ma[k]e [Sergeant] look bad she retaliates, in any way [she]
> can.  If you call her out on poor performance she retaliates.  If you talk to
> leadership about something she does, she retaliates . . . .
>
> [S]he just keeps coming at me, anyway she can.  This is the most hostile
> work environment I have ever experienced.  I love Whole Foods but people
> like [Sergeant] ruin it for everyone[;] it leads me to believe whole foods needs
> a worker union of some sort, to insulate it from [Sergeant's] kind of
> abuse. . . .

(Dkt. # 31 Ex. 20.)  The March 6 email illustrates Sergeant's conduct with one concrete

example, the text messages sent after Iceberg declined to apply for vitamin buyer.  The

email never mentions the incident raised by Flowers the previous day.  About job

performance, in fact, the email says only that Iceberg thought he provided the second-

best customer service on his team.  Iceberg resigned on March 9, 2010.

## II.  STANDARD

Summary judgment is proper only if "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P.

12

56(a).  A genuine dispute of material fact exists if "a reasonable jury could return a verdict for the non[-]moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court must draw each reasonable inference in favor of the non-moving party. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### III.  DISCUSSION

Iceberg alleges sex discrimination, intentional infliction of emotional distress, and retaliation in violation of public policy.

### A. Discrimination

There are six claims for sex discrimination:  *Quid pro quo* sexual harassment, a hostile work environment, and retaliation, in each instance under both federal law, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan law, the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 *et seq*. Although he cites each pertinent ELCRA legal standard, Iceberg never applies the ELCRA or Michigan case law to either the hostile work environment claim or the retaliation claim.  (*See* Pl.'s Resp. 67-71.)  Therefore, only the *quid pro quo* ELCRA claim needs separate attention here.  *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[.]").

One of the central allegations may be dispensed with at the threshhold.  The complaint alleges Sergeant's "demands for sexual favors."  (Compl. 5, Dkt. # 20.)  This phrase appears even though neither now nor at any time before the case was filed had any document or testimony identified a "demand" for a "sexual favor."  "Demand" evokes an unmistakable request; "demands for sexual favors" envisions multiple such

13

requests. The undisputed record shows that Sergeant employed jests, innuendo, and general boorishness.  To assert that Sergeant made "demands for sexual favors," however, contorts the evidence.

### 1.  *Quid Pro Quo*: Title VII

A supervisor may neither condition a job benefit on an employee's accepting a sexual advance nor inflict a job detriment because an employee rejects a sexual advance.  *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000).  Either act typically constitutes *quid pro quo* sexual harassment under Title VII.  However, an advance must be "unwelcome," at least an implicit promise or threat must occur, a job benefit must qualify as "tangible," a job detriment must qualify as "tangible," and a job detriment must "result" from the rejection of an advance.  *See Bowman*, 220 F.3d at 461-62 (unwelcome; "tangible" detriment); *Highlander v. K.F.C. Nat. Mgmt. Co.*, 805 F.2d 644, 649 (6th Cir. 1986) (causation); *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 329 n.6 (4th Cir. 2012) ("tangible" benefit); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603-04 (2d Cir. 2006) ("tangible" detriment; presence of a threat); *Wisniewski v. Pontiac School Dist.*, ___ F.Supp.2d ____, 2012 WL 683399, *7-9 (E.D. Mich. 2012) (unwelcome; causation).  Each of these elements causes trouble for Iceberg.

Iceberg contends that from fall, 2008, until August, 2009, Sergeant granted Iceberg job benefits in exchange for his submitting to her sexual advances.  But "the gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986).  When asked at his deposition, "Were you flattered that [Sergeant] was interested in you?" Iceberg

14

answered, "Yes."  (Sergeant Dep. 102.)  Days before resigning he wrote, in an email

listing his *problems* with Sergeant, that he "was perfectly fine" with Sergeant's liking him

and with Sergeant's favoring him.  With a smile he told Mattoon, "I banged her."

The evidence the other way is Mattoon's testimony that, based on "how [Iceberg]

explained the sex," it appeared to "repulse him."  (Mattoon Dep. 38.)  Iceberg concedes,

however, that he agreed to meet Sergeant, that he chose and consumed a bottle of

wine, and that he consented to sex.  A person can submit to sex after not welcoming

sexual advances; so too, a person can regret sex after welcoming sexual advances.  A

person can welcome sexual advances some days and not others; or a person can feel

profoundly confused.  *Cf.* Judith Butler, *Sexual Consent: Some Thoughts on

Psychoanalysis and Law*, 21 Colum. J. Gender & L. 405, 419-27 (2011).  Perhaps

Iceberg felt profoundly confused.  Except, up to summer, 2009, the record evidence

shows him only either welcoming or ignoring Sergeant's advances.  He claims fear

prevented him from acting differently, from rebuking or rejecting her.  But when he was

bored at home in February, 2009, he not only sent her a message, he sent

"iamsoboredthissucks," implying he wanted entertainment.  Again, he said he "was

perfectly fine" with her.

At any rate, no "*quid pro quo*" arises from promising mere petty job benefits.

Something "tangible," such as a pay increase, a promotion, or a "significant" new

responsibility is needed.  *See Bowman*, 220 F.3d at 461-62; *Dulaney*, 673 F.3d at 329

n.6.  Before summer, 2009, Sergeant often scheduled Iceberg to work in the morning,

which he liked, and twice she changed the schedule to hide the fact that he arrived late.

(Iceberg Dep. 157-58.)  Nothing in the record shows this was unique treatment.  Equally

15

to the point, a preferred shift and a couple of tardy-for-work passes fails to satisfy the law's definition of "tangible."

Allegedly, Sergeant also once said, "You're going to be my next [associate team leader]." (*Id.* 166.)  This seems an odd statement, if Sergeant lacked the authority to promote Iceberg, but even assuming that Sergeant told Iceberg she had the power to promote him (and this permits Iceberg the benefit of testimony he never cites, s*ee id.* 165), the statement was empty.  Although Iceberg had up to then appeased her, Sergeant blocked Iceberg's promotion.  According to her uncontroverted testimony, Sergeant opposed Iceberg's candidacy for associate team leader because he displayed a negative attitude at both his interviews.  (Sergeant Dep. 29.)  So, Iceberg received no "tangible" job benefit.  And Sergeant fulfilled no promise or threat.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ("[If a] claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim [instead of a *quid pro quo* claim.]").

For that matter, the court is uncertain which Iceberg means to say it was, promise or threat. Did Sergeant mean, "*If you keep sleeping with me*, I'll promote you," or did Sergeant mean, "*If you stop sleeping with me*, I'll *not* promote you"?  Actually, the record supports neither interpretation.  Iceberg abided Sergeant's advances but Sergeant opposed the promotion; Sergeant opposed the promotion but then treated Iceberg well for several more months.  The course of events and the undisputed record show that the statement included no unstated promise or threat.

Iceberg contends that after August, 2009, Sergeant and others inflicted job detriments because Iceberg refused to see Sergeant.  Several of the alleged detriments

16

are not much more than trifling.  Iceberg was exposed to Sergeant's muttering and unhappiness, he was occasionally ignored when he asked for a break, he was excluded from a few training sessions, and he was moved to the evening shift.  Each of these discomforts constitutes "a mere inconvenience"—less than a "tangible" job detriment justifying a lawsuit and judicial intervention.  *Bowman*, 220 F.3d at 461.

Iceberg was also assigned new job duties; a "significant" (and therefore "tangible") change for the worse, he argues.  An "alteration of job responsibilities" is not a "tangible" job detriment.  *Id.* at 461.  After August, 2009, Iceberg continued to stock shelves and serve customers, but he stopped receiving returns and buying for the store.  He began to stock bulk herbs.  No record evidence establishes that handling bulk herbs rather than returns and buying left Iceberg with a materially diminished or objectively less desirable position.  Rather, Sergeant explains, she periodically shuffled her employees' tasks so that each employee could learn new skills.  (Sergeant Dep. 46-48.)  Iceberg fails to show that he suffered more than a mere "alteration of job responsibilities."

When Iceberg asked to work thirty-two hours a week, he was told he could work twenty-four.  By accepting twenty-four hours a week he lost his benefits, and he cites this loss as a "tangible" job detriment.  It is not, because Iceberg remained free to work full-time and receive benefits.  He, not the store, sought to change the conditions of his employment.  Iceberg claims another employee had worked thirty hours a week which, he says, shows that the store could accommodate Iceberg.  But Broadwell testified that allocating Iceberg thirty-two hours would have left an awkward unfilled eight-hour shift.  Iceberg never alleges that the store filled a similar gap (or overcame some comparable

17

obstacle) for the other employee.  In other words, nothing in the record indicates that Iceberg and the other employee requested thirty hours under similar circumstances.

Iceberg next raises the discipline he suffered.  Arguably, the warnings and lectures Iceberg received in October, November, and December, 2009, from Sergeant, Austin, and another team leader cannot quite equal a "tangible" job detriment. (They caused no immediate change to his job, although perhaps they damaged his chance of promotion.)  Regardless, severe discipline undoubtedly occurred in the winter and spring of 2010.  Further, Sergeant's alleged comment, "You're totally protected, you just have to go along with what I say," although vague, raises a material dispute of fact as to whether a threat was made.  The problem for Iceberg is the overwhelming evidence establishing that the discipline (especially the discipline in 2010) occurred because of his performance.

Mattoon and Sergeant state, and Iceberg concedes, that Iceberg's attitude first attracted attention in summer, 2009, before he rejected Sergeant.  Another team leader warned Iceberg about his attitude before Sergeant did.  Also before Sergeant ever warned him about his attitude, Iceberg wrote Mattoon, "Any way I can make her life suck . . . I will."  The comment both displays an attitude and suggests Iceberg displayed an attitude in front of Sergeant.  Also, shortly after Sergeant's October 30 and November 5 warnings, Iceberg wrote Sergeant, "I[']m not going to make any sarcastic or negative comments to team members or anything like that. . . .  I[']m not going to be like I have been."

Again the possible but ultimately superficial counter-evidence appears in the mixed messages of Mattoon.  In a November 1, 2009, message Mattoon told Iceberg

18

both that Iceberg worked hard and that he imagined that Sergeant preferred Iceberg's
sexual attention to that of her own boyfriend.  However, Mattoon testified later about the
decline of Iceberg's attitude, and in the November 1 message Mattoon wrote also that
Iceberg was "high and paranoid" if he thought Sergeant "want[ed] [him] gone."  An
employee can both work hard and display a bad attitude; there is no inconsistency.  And
Mattoon's reflections on sexual desire and drug-induced paranoia more or less cancel
each other.  Mattoon telling Iceberg not to worry tends to show that the statement about
Sergeant was mere banter—evidently amplifying a sharp but jocular tone set at least in
part by Iceberg ("I banged her, Bud"; "Any way I can make her life suck . . . .").  Iceberg
raised no objection to Mattoon's vulgar comment about Sergeant, and a short time later
Iceberg called Sergeant a "demon woman."  Iceberg generated, approved, or at least
tolerated sexual or gender-loaded insults about others that were worse than any he had
endured about himself.  *Cf. Beard v. Flying J., Inc.*, 266 F.3d 792, 798 (8th Cir. 2001)
("[E]vidence that [a plaintiff] engaged in behavior similar to what [he] claimed was
unwelcome or offensive is evidence that the behavior was not unwelcome.").

Even stronger evidence establishes Iceberg's poor performance after November,
2009.  In December, Austin, the head of the store, in effect told Iceberg to fix his attitude
and to stop blaming Sergeant for his trouble.  During the January job dialogue Sergeant
and Broadwell raised Iceberg's lackluster work and Iceberg admitted to inconsistent
customer service.  In February Sergeant rebuked Iceberg for sending an imperious
email demanding a schedule change.  Then a mystery shopper criticized Iceberg for
lacking a "sincere professional attitude" and for denigrating the store's homeopathic
products.  Broadwell warned Iceberg that his re-occurring problem with service needed

19

to stop.  But a few weeks later Flowers, the head of customer service, reported in detail how Iceberg was rude and dismissive to a customer.  Finally, on March 6, 2010, Austin issued a final warning.  Iceberg responded to the final warning only with blistering criticism of Sergeant, notwithstanding the substantiated and largely independent censure by Austin, Broadwell, a mystery shopper, and Flowers.  Despite his many assertions of Sergeant's ill will, Iceberg raised no recent or compelling detail, specific act, or even stray remark suggesting that Sergeant wanted or contrived his fall.  (Sergeant's "you're totally protected" comment, the last even somewhat concrete sign of a plot, had occurred in mid-2009.)

Nothing in the record evidences a conspiracy among Sergeant and the others to sabotage Iceberg.  Nothing in the record shows Sergeant as some kind of Svengali convincing others to fault or discipline Iceberg.  Iceberg's emails, Iceberg's admissions (both at the time and now), and the certain disinterest of the mystery shopper (probably of Flowers as well) decisively demonstrate Iceberg's poor on-the-job behavior.  The record requires the conclusion that Iceberg suffered criticism and discipline only because he performed poorly.

The Title VII *quid pro quo* claim fails.

## 2.  *Quid Pro Quo*: ELCRA

An ELCRA *quid pro quo* claim requires, among other things, sexual conduct that is unwelcome, a job benefit or detriment that is "tangible," and "a causal relationship between the two."  *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916, 920 & nn. 7-8 (Mich. 2000).  Iceberg's welcoming of Sergeant's behavior, the absence of a "tangible"

20

benefit or detriment, and the absence of causation prevent Iceberg from proving that *quid pro quo* sexual harassment occurred.

Also, under Michigan law "actionable sexual harassment requires conduct or communication that *inherently* pertains to sex." *Corley v. Detroit Bd. of Educ.*, 681 N.W.2d 342, 345 (Mich. 2004) (emphasis in original). Iceberg welcomed Sergeant's sexual advances until about August, 2009, when he rejected her. After that no more sexual advances occurred. The statement, "You're totally protected, you just have to go along with what I say," was too nebulous to pertain to sex "inherently." The statement, after all, followed Iceberg's rejection of a request merely to "hang out." (Iceberg Dep. 205-07.) No word or deed later was even obliquely sexual. *See Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 473 (6th Cir. 2012) (Michigan law) ("[T]he standard is not whether certain conduct or comments could arguably manifest sexual desire, but whether the conduct or comments *inherently pertain* to sex.") (emphasis in original); *cf. Corley*, 681 N.W.2d at 346 ("[W]hat may have been sexual in this case did not involve harassment, while what did involve harassment was not sexual.").

The ELCRA *quid pro quo* claim fails.

### 3. Hostile Work Environment

Whole Foods argues that Iceberg failed to complain to the store about sexual harassment. A failure to report possible sexual harassment can sometimes relieve an employer of vicarious liability. *See Keeton v. Flying J., Inc.*, 429 F.3d 259, 262-63 (6th Cir. 2005). Iceberg, however, insists he complained about sexual harassment to Kipela in November, 2009, to Austin in January, 2010, and to Broadwell in February, 2010. Kipela, Austin, and Broadwell each deny receiving a complaint, (Austin Dep. 59; Kipela

21

Dep. 23, Dkt. # 33 Ex. 5; Broadwell Dep. 45-49), and Iceberg's response brief exaggerates the clarity of some of what Iceberg claims he said.  But what Iceberg claims he said sufficed as a timely complaint, and in a Rule 56 analysis, Iceberg's testimony outweighs the contrary statements by Kipela, Austin, and Broadwell.

The hostile work environment claim still fails, though, mostly for the same reasons that the *quid pro quo* claims fail.  Generally, "hostile work environment" means a workplace "permeated with discriminatory intimidation, ridicule, and insult."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  A plaintiff must present evidence of unwelcome, severe or pervasive sexual harassment.  *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).

As already explained, the record shows that Iceberg welcomed Sergeant's advances until mid-2009.  After Iceberg rejected her, Sergeant swore at him and sent him two rude text messages.  Then at work she sometimes muttered to herself, raised her voice, failed to tell Iceberg about a meeting, or ignored Iceberg's request for a lunch break.  The other harms Iceberg cites were neither harassing nor based on Iceberg's sex—they occurred because of Iceberg's job performance.  At most, Iceberg suffered sporadic, petty, barely offensive acts, which falls short of "severe or pervasive" harassment.  *See Bowman*, 220 F.3d at 463.

The hostile work environment claim fails.

### 4.  Retaliation

To establish that he suffered retaliation for reporting sexual harassment, a plaintiff must either present direct evidence of retaliation or, with circumstantial evidence, sustain his burden under the *McDonnell Douglas* framework.  *Morris v.*

22

*Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  No claim of direct evidence is presented, so the *McDonnell Douglas* framework governs.

Iceberg bears the burden to establish a *prima facie* case of retaliation; a *prima facie* case requires Whole Foods to provide a legitimate, non-discriminatory explanation for its conduct; a facially sufficient explanation in turn requires Iceberg to show that the explanation is merely a pretext.  *Morris*, 201 F.3d at 792-93.

A *prima facie* case must include evidence of a "causal connection" between reporting sexual harassment and suffering retaliation.  *Id.*  The Title VII *quid pro quo* section discusses why Iceberg cannot show he suffered disapproval or discipline because he rejected Sergeant.  Likewise, he cannot show he suffered disapproval or discipline because he reported Sergeant.  The undisputable record shows that he suffered disapproval and discipline because his work warranted it.  Iceberg's performance also constitutes a legitimate, non-discriminatory reason for the store's conduct.  Iceberg cannot prove pretext precisely because he cannot raise a material dispute about causation.

The retaliation claim fails.

## B.  Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress demands behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  *Dally v. Dykema Gossett*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010).  The record shows a certain degree of incivility and a measure of vulgarity on all sides; by Sergeant (who allegedly called Iceberg a "punk bitch"), by Iceberg (who called

23

Sergeant a "demon woman"), and by Mattoon (who, about Sergeant, wrote the most provocative innuendo of all).  But the record contains no "outrageous" behavior "beyond all possible bounds of decency."

The intentional infliction of emotional distress claim fails.

### C.  Retaliation in Violation of Public Policy

Terminating an at-will employee because he refuses to violate the law on the job violates Michigan public policy.  *Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004).  Iceberg alleges that Whole Foods constructively discharged him because he refused to promote health supplements in violation of the Dietary Supplement Health and Education Act ("DSHEA") of 1994.  Pub. L. No. 103-417, 108 Stat. 4325 (1994).

 The store directed Iceberg to ensure that the customer felt satisfied.  Iceberg says this seemed like pressure to diagnose customers' ailments and to offer supplements as treatments.  Iceberg acknowledges, however, that the store told him to discuss a supplement using only specific phrases, such as "supports health."  He acknowledges also that the store repeatedly told him not to diagnose a customer, not to suggestive sell a supplement, and not to use a word such as "treat" or "cure."  No one ever told Iceberg that the general need to satisfy the customer justified violating the specific rule against diagnosing an ailment or promising a treatment.  In any event, Iceberg's response brief neither cites a provision of DSHEA nor explains how following the store's instructions would violate DSHEA or any other law.

And the response brief never attempts to connect Iceberg's concerns about promoting supplements to the criticism and discipline Iceberg suffered.  It raises only

24

Iceberg and Austin's January 3, 2010, meeting, at which, the brief claims, Austin discussed suggestive selling and Iceberg's FDA complaint.  (Pl.'s Resp. 71-73.)  But actually the meeting's one topic was Iceberg's plan to unionize the store—Iceberg's own testimony establishes this.

The retaliation in violation of public policy claim fails.

### IV.  CONCLUSION

Scott Iceberg's supervisor liked him, and initially he liked her.  Perhaps inwardly Iceberg felt a mix of thrill and sorrow about this; the record in this action shows only that he both acceded to her advances and at times appeared to reciprocate her desire. They had consensual relations on one occasion.  He apparently regretted it, and told her they would not socialize again; she allegedly responded by becoming a nuisance to him. Much later, he resigned.

Iceberg considers his supervisor's behavior the reason he lost his job.  He sees signs of a conspiracy to discipline him and tarnish his job record; and he sees harassment, both a wrong in itself and a cause of his poor job performance (if it was poor).

Iceberg seems to have been an earnest but fragile employee whose work began to deteriorate just before the definitive end of a short and diffident relationship with Sergeant.  The available evidence establishes that Iceberg suffered discipline only because his attitude and his service declined.  It may be, in fact, that his supervisor accelerated the decline, but in law she created, at worst, difficulty tolerable to an ordinarily firm person.  If Iceberg embodied a rare frailty, that is undoubtedly a

25

misfortune for him.  However, painstaking review of the record reveals no actionable

harassment, retaliation, or outrageous behavior on the part of Defendant.  Accordingly,

IT IS ORDERED that Whole Foods's motion for summary judgment [Dkt. # 31] is

GRANTED.

　　　　　　　　　　　　　　　　 s/Robert H. Cleland                                  
　　　　　　　　　　　　　　　　ROBERT H. CLELAND
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

Dated:  October 31, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, October 31, 2012, by electronic and/or ordinary mail.

　　　　　　　　　　　　　　　　 s/Lisa Wagner                                        
　　　　　　　　　　　　　　　　Case Manager and Deputy Clerk
　　　　　　　　　　　　　　　　(313) 234-5522